**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **AON CORP. WAGE & HOUR EMPLOYMENT PRACTICES LITIGATION** ) ) ) ) ) ) ) | Case No. 08 CV 5802<br><br>Honorable Judge Charles P. Kocoras<br><br>Magistrate Judge Susan E. Cox |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER
GRANTING: (1) RULE 23 CLASS CERTIFICATION OF THE CLAIMS
ARISING UNDER THE ILLINOIS MINIMUM WAGE LAW IN THE
*PIERSANTI V. AON RISK SERVICES, INC.*, N.D. ILLINOIS ACTION; AND
(2) FLSA CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND
FOR *HOFFMANN-LAROCHE* NOTICE IN THE *MILLER ET AL. V. AON
CORPORATION, ET. AL.*, S.D. NEW YORK ACTION**

Jody A. Boquist
John A. Ybarra
Amanda H. Wright
LITTLER MENDELSON, P.C.
200 N. LaSalle Street, Suite 2900
Chicago, IL 60601
312.372.5520

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ................................................................................. 1

II.      PLAINTIFFS' BRIEF IS REPLETE WITH INACCURACIES AND
INADMISSIBLE EVIDENCE ............................................................... 1

     A.      Plaintiffs' Counsel's Unsupported Statements Have No Evidentiary Value ........ 1

     B.      Inaccurate Quotations and Summaries of Witness Testimony ............................ 2

     C.      Plaintiff's Declarations Should Be Stricken From The Record .......................... 2

III.      PROCEDURAL HISTORY AND CURRENT STATUS OF LITIGATION ................. 3

     A.      The Illinois Action ............................................................................ 3

     B.      The New York Action ....................................................................... 3

     C.      The Parties Conducted 13 Depositions and Massive E-Discovery ..................... 4

IV.      FACTS ............................................................................................. 4

     A.      Evolution of the Organizational Structure ......................................... 4

     B.      CSU Background ............................................................................... 6

     C.      The Job Duties of the Plaintiffs and Other Client Specialists Vary By
Individual CSU ................................................................................. 8

         1.      Plaintiff Miller ................................................................... 8

         2.      Plaintiff Piersanti ............................................................. 10

         3.      Plaintiff Cooper ............................................................... 10

         4.      Company Records ............................................................ 11

V.      THE NEW YORK PMU .................................................................... 12

     A.      Background ..................................................................................... 12

     B.      The Duties of the PMU Plaintiffs and Other PMU Specialists Varied
Greatly ........................................................................................... 13

         1.      Plaintiff Caesar ............................................................... 13

         2.      Plaintiff Holmes .............................................................. 13

TABLE OF CONTENTS
(CONTINUED)

PAGE

3. Plaintiff Craig ...................................................................... 14

VI. PLAINTIFFS' REQUEST FOR CONDITIONAL CERTIFICATION OF FLSA CLAIMS IN THE NEW YORK ACTION SHOULD BE DENIED.............................. 14

    A. Legal Standard for FLSA Conditional Certification ............................................ 15

    B. Given The Substantial Discovery In This Case, the "Second Step" Certification Analysis Should Apply.................................................. 16

    C. Notice to Additional Plaintiffs in this Case Serves No Judicial Purpose ............ 18

    D. Defendant ARSNY Has a Constitutional Right to Present the Factual Issues For Jury Consideration ............................................. 19

    E. In Sum, Plaintiffs in the New York Action Cannot Satisfy the FLSA Requirements for Conditional Certification......................................... 19

VII. PLAINTIFFS' REQUEST FOR RULE 23 CERTIFICATION OF THEIR IMWL CLAIMS IN THE ILLINOIS ACTION SHOULD BE DENIED .................................. 20

    A. Legal Standard for Rule 23 Certification......................................................... 20

    B. Plaintiffs Cannot Satisfy the Rule 23 Requirements for Class Certification ....... 21

        1. Plaintiffs Have Not Established Numerosity.......................................... 21

        2. Plaintiffs Have Not Established Commonality...................................... 22

        3. Plaintiffs Have Not Established Typicality ........................................... 23

        4. Plaintiffs Fail to Identify Common Questions Which Predominate ........ 23

        5. A Class Action Is Not the Superior Method Of Adjudicating Plaintiffs' Claims .................................................................. 24

    C. In Sum, Plaintiffs Cannot Establish the Requirements for Certification of the IMWL Claim Pursuant to FRCP 23........................................... 25

VIII. CONCLUSION............................................................................. 25

ii.

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Pages**

*Basco v. Walmart Stores, Inc.*, 216 F. Supp. 2d 592 (E.D. La. 2002)                                    24

*Betts v. Sundstrand Corp.*, 1999 U.S. Dist. LEXIS 9743 (N.D. Ill. Jun. 21, 1999)     21

*Bunyan v. Spectrum Brands, Inc.*, 2008 U.S. Dist. LEXIS 59278                                    17

*Burkhart-Deal v. Citifinancial, Inc.*, 2010 U.S. Dist. LEXIS 9531 (W.D. Pa. Feb.     22, 23
4, 2010)

*Caulton v. Merchants' Credit Guide Co.*, 2007 U.S. Dist. LEXIS 12577 (N.D.           22
Ill. Feb. 22, 2007)

*Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302 (N.D. Ill. 1995)                19

*Cimino v. Raymark Indus.*, 151 F.3d 297 (5th Cir. 1998)                                              19

*Clark v. Experian Info., Inc.*, 233 F.R.D. 508 (N.D. Ill. 2005).                                       24

*Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735 (D.C. Cir. 1996)                            19

*Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-0840, 2005 U.S. Dist. LEXIS           16
30382, (W.D.N.Y. Oct. 17, 2005)

*Evancho v. Sanofi-Aventis U.S. Inc.*, No. 07-2266, 2007 U.S. Dist. LEXIS 93215     17
(D.N.J. Dec. 18, 2007)

*Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042 (N.D. Ill. 2003) (Norgle, J.)    15, 16

*Forney v. TTX Co.*, No. 05-CV-6257, 2006 U.S. Dist. LEXIS 30092 (N.D. Ill          16
Apr. 17, 2006)

*Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298 (S.D. Tex. 2000)                       21

*Hamilton v. O'Connor Chevrolet, Inc.*, 2006 U.S. Dist. LEXIS 44149 (N.D. Ill.      23
Jun. 12, 2006)

*Harris v. FFE Transp. Servs.*, 2006 U.S. Dist. LEXIS 51437 (N.D. Tex. May 15,      15, 17
2006)

*Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111 (D. Kan. 1995)     22

*Heckler v. DK Funding, LLC*, 502 F. Supp. 2d 777 (N.D. Ill. 2007)                           15

*Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265 (M.D. Ala. 2004)  16

*Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 2007 U.S. Dist. LEXIS 96151  18
(E.D. La. Aug. 21, 2007)

*Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567 (E.D. La. 2008)  18

*Kohen v. Pac. Inv. Mgmt. Co.* LLC, 244 F.R.D. 469 (N.D. Ill. 2007)  21

*Lanzarone v. Guardsmark Holdings, Inc.*, 2006 U.S. Dist. LEXIS 95785 (C.D.  24
Cal. Sept. 7, 2006)

*Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 507126, (N.D. Ill. Apr. 3,  24
2002);

*Lorillard v. Pons*, 434 U.S. 575 (1978)  19

*Meiresonne v. Marriott Corp.*, 124 F.R.D. 619 (N.D. Ill. 1989)  22

*Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759 (N.D. Ill. 2004  15

*Mike v. Safeco Inc. Co. of Am.*, 274 F. Supp. 2d 216 (D. Conn. 2003)  16

*Morisky v. Public Serv. Elec. and Gas Co.*, 111 F. Supp. 2d 493 (D.N.J. 2000);  16

*Pfohl v. Farmers Ins. Group*, No. CV-03-3080, 2004 U.S. Dist. LEXIS 6447  16
(C.D. Cal. Mar. 1, 2004)

*Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527 (7th Cir. 1999)  2

*Radmanovich v. Combined Ins. Co of Am.*, 216 F.R.D. 424 (N.D. Ill. 2003)  21

*Ray v. Motel 6 Oper. Ltd.*, No. 3-95-828, 1996 U.S. Dist. LEXIS 22565 (D.  16
Minn. 1996).

*Reich v. Homier Distrib. Co., Inc.*, 362 F. Supp. 2d 1009 (N.D. Ind. 2005)  16

*Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993)  23

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992)  20, 23

*Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381 (W.D.N.Y. 2005)  15

*Siles v. ILGWU Nat'l Retirement Fund*, 783 F.2d 923 (9th Cir. 1986)  21

*Smith v. T-Mobile USA, Inc.*, No. CV 05-5274, 2007 U.S. Dist. LEXIS 60729  23

(C.D. Cal. Aug. 15, 2007)

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001)      15

*Thiessen v. GE Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001)      16

*Valcho v. Dallas Co. Hosp. Dist.*, 574 F. Supp. 2d 618 (N.D. Tex. Aug. 19, 2008)      16, 17

*Valentino v. Howlett*, 528 F.3d 975 (7th Cir. 1976)      20, 21

*Weeks v. Bareco Oil Co.*, 125 F.2d 84 (7th Cir. 1941)      24

*White v. Osmose, Inc.*, 204 F. Supp. 2d 1309 (M.D. Ala. 2002)      16

*Williams v. Chartwell Fin. Servs.*, 204 F.3d 748 (7th Cir. 2000)      21

*Winokur v. Bell Federal Sav. & Loan Assoc.*, 1972 U.S. Dist. LEXIS 14489 (N.D. Ill. Mar. 27, 1972)      21

**STATUTES**      **PAGES**

29 C.F.R. § 541.200 et seq.      14

29 C. F. R. § 541.200(a)(1)–(3)      15

29 U.S.C. § 216(b)      15

Fed. R. Civ. P. 23(a)      20

Fed. R. Civ. P. 23(b)(3)      24

## I.      INTRODUCTION

Plaintiffs' motion and supporting brief serve only to highlight what has become obvious through months of written discovery and more than a dozen depositions:  This case will undoubtedly require a specific, individualized inquiry into each Plaintiff's claims to determine liability, and no common issues predominate their claims.  As such, Plaintiffs' state law and FLSA claims are ultimately unmanageable as a class or collective action.

In short, the record evidence demonstrates that the named Plaintiffs in this case performed widely different duties in <u>six</u> job categories within <u>two</u> different units for <u>two</u> different employers located in <u>two</u> different states.

## II.     PLAINTIFFS' BRIEF IS REPLETE WITH INACCURACIES AND INADMISSIBLE EVIDENCE

### A.      Plaintiffs' Counsel's Unsupported Statements Have No Evidentiary Value

The issue in this litigation is whether *each* individual was misclassified as exempt in his or her employment.   In this case, there exists no homogenous group of individuals who performed the same functions.   Apparently recognizing this deficiency in their argument, Plaintiffs' brief relies on sweeping general proclamations made by Plaintiffs' counsel without a *single* citation to the record, such as:

- "[T]he duties of Aon Client Specialists job [sic] are overlapping, interchangeable and largely defined by comprehensive Aon corporate procedures, policies and guidelines."  (Pl. Brief, p. 5);

- "Within their assigned departments, Client Specialists perform the same baseline functions in the exact same manner, utilizing identical Aon computer generated checklists, processing flow charts and templates."  (Pl. Brief, p. 6);

- "Client Specialists in both NY and IL PMU and CSU were micro-managed, performed routine and repetitive tasks and possessed little, if any judgment and/or discretion in performing their job functions and responsibilities." (Pl. Brief, p. 10); and

- "The evidence overwhelmingly demonstrates that within their respective departments, Aon has always treated Client Specialists of all levels in PMU and CSU, respectively, as a homogeneous group for internal human resource and FLSA purposes."  (Pl. Brief, p. 7).

Why, if the "evidence" so "overwhelmingly demonstrates" any of these statements made by Plaintiffs' counsel, did Plaintiffs not produce any of the evidence to this Court?  In fact, each of these baseless statements is flatly contradicted by the *actual* record evidence, including Plaintiffs' own deposition testimony.

### B.   Inaccurate Quotations and Summaries of Witness Testimony

Throughout their brief, Plaintiffs misquote Defendants' witnesses' testimony. For example, Plaintiffs claim that Nick Sellers, a CSU Client Specialist whose testimony was subpoenaed by Plaintiffs, gave "unequivocal testimony" that Client Specialists at Aon had no "discretion." (Pl. Brief, p. 10). Yet, Plaintiff's counsel fails to mention that he did not define "discretion" as a legal term of art for Mr. Sellers, nor did he preface his questions about "discretion" by ensuring that Mr. Sellers understood the term. (Sellers 85-87). To that end, Mr. Sellers testified as follows:

> Q. What does "discretion" mean to you, in the context of the questions you were asked?
>
> A. Honestly, I don't know.
>
> Q. Is it fair to say, though, that you do make decisions on a regular basis about how to do your job?
>
> A. Every day, yes.

(Sellers 144-146).

Similarly, Plaintiffs inexplicably claim that Bill Huckins' testimony supports their claim that "whether assigned to PMU or CSU, Client Specialists are *production workers* who carry out the daily business activities of Aon ACS described above." (Pl. Brief, p. 4). Huckins, however, never made that statement. Rather, the cited testimony relates to GenPact, a third party contractor in India, that performed basic document production work *at the direction* of CSU Specialists, since 2007. (Huckins 124-125). Contrary to Plaintiff's outlandish claims otherwise, Huckins never testified that these individuals were members of the "CSU" or "PMU." (*Id.*).

### C.   Plaintiff's Declarations Should Be Stricken From The Record

Similarly, Plaintiffs pointedly avoid their own deposition testimony and instead seek to rely on *ad hoc* declarations that: (1) improperly contradict their own testimony; (2) contain inadmissible hearsay evidence; and (3) reinforce the fact that Plaintiffs have no actual evidence to share with the Court to support their claim that they are similarly situated to a class of their former co-workers. As set forth in the attached chart, Plaintiffs' declarations are replete with statements that constitute inadmissible hearsay, are conclusory, and are directly contradicted by their own prior sworn deposition testimony. *See* **Exhibit 11**. Defendants ask this Court to strike and disregard these self-serving, conflicting statements, attached as Exhibits I, J, K and L to

Plaintiff's Brief. *See e.g., Piscione v. Ernst & Young, L.L.P.,* 171 F.3d 527, 532 (7th Cir. 1999) (disregarding "self-serving" affidavit that contradicted deposition testimony).

## III.    PROCEDURAL HISTORY AND CURRENT STATUS OF LITIGATION

### A.    The Illinois Action

On April 4, 2008, Plaintiff Angela J. Piersanti ("Piersanti") filed an action in the Northern District of Illinois ("the Illinois action") against her former employer, Aon Risk Services of Maryland, Inc. To date, only one individual, Joyce Cooper, a former Client Specialist, has joined the Illinois action. Denise Mariette Miller, referenced below as a party to the New York action, may also be a putative "class" member as a former Senior Client Specialist in the Glenview CSU. *Id.*

Plaintiffs in the Illinois action claim that they were employed on a "salaried" basis and argue that their former positions in the Client Services Unit ("CSU") did not qualify under the exemptions of the Fair Labor Standards Act ("FLSA"), and therefore are entitled to statutory overtime pay. The Illinois Complaint also raises identical claims for unpaid overtime under the Illinois Minimum Wage Law ("IMWL") and the Illinois Wage Payment and Collection Act ("IWPCA").

Although Piersanti indicated in her Complaint that she would seek to represent a class of individuals with regard to all of her claims, the Illinois Plaintiffs explicitly limit their motion to certify a class under FRCP 23 regarding their IMWL claims. (Docket # 35). They affirmatively do <u>not</u> seek to certify a conditional collective action or issue notice with regard to the FLSA, nor do they seek to certify a FRCP 23 class with regard to their IWPCA claims.

### B.    The New York Action

On May 15, 2008, Plaintiffs Denise Mariette Miller, Meaux Craig, Janet Holmes and Wendy Caesar filed a similar action in the Southern District of New York (the "New York action") against their former employer, Aon Risk Services of New York, Inc. ("ARSNY"), in which they allege that they were misclassified as exempt while employed in the former New York CSU and/or Policy Maintenance Unit ("PMU"), in violation of the FLSA and the New York Labor Law.

Miller was previously employed in the New York CSU as a Client Specialist and Senior Client Specialist. (Miller ¶ 9; Miller 103-06).[1] She was also employed as a Senior Specialist in the PMU, albeit well outside the potentially relevant statutory limitations period for this action. (*Id.*). Holmes was formerly employed as a Specialist in the New York PMU. (Holmes 163-64). Craig and Caesar were classified as Senior Specialists in the PMU, but Craig was employed in that role outside the limitations period. (*Infra* p. 13; Craig 85; Caesar 171). In April 2007, the New York CSU and PMU operations were closed. (Propati 291).

Despite the allegations of their Complaint (and unlike the Illinois Plaintiffs), the New York Plaintiffs are explicitly limiting the instant motion to seek conditional certification of two separate statewide opt-in classes pursuant to FLSA § 216(b): (1) a "CSU class" comprised of former Associate Client Specialists, Client Specialists and Senior Client Specialists who worked in the New York CSU; and (2) a "PMU class" comprised of former Associate Specialists, Specialists and Senior Specialists who worked in the New York PMU. (Docket # 35). Plaintiffs do <u>not</u> seek to certify a class on their state law claims under Rule 23. *Id.*

### C. The Parties Conducted 13 Depositions and Massive E-Discovery

The parties have engaged in extensive oral and written discovery since the inception of these matters. (*See* Pl. Ex. A). Defendants have produced over 390,000 pages of documents to Plaintiffs. Defendants have deposed all six (6) named and opt-in Plaintiffs, and Plaintiffs have deposed five (5) defense witnesses and two (2) third-party witnesses. Plaintiffs have no pending objections to Defendants' discovery responses, and thus presumably have all the information necessary to fully litigate the question of whether Rule 23 or FLSA certification is appropriate in these actions.

## IV. FACTS

### A. Evolution of the Organizational Structure

Defendants are in the insurance brokerage business. As part of that brokerage business, Defendants provide "pre" and "post" placement services to both internal clients (brokers) and external clients (underwriters and insured) clients in connection with the insurance policies it brokers. (Propati 72-73; Cooper 114-117, 203). In 2001, Managing Director Bill Huckins, ARS New York, began to oversee a dedicated unit, unique to the insurance brokerage industry, that

---

[1] All exhibits are located in Defendant's Appendix in Support, which will be filed contemporaneously.

was formed to carry out these services. (Huckins 63). This unit was initially known as the Client Services Business Unit ("CSBU"), which contained various subunits, including the PMU. (Propati 217-18; Miller 129-30). Similar units were created in Los Angeles, Houston and Glenview, Illinois. The Glenview location was operated by ARS of Maryland, Inc. and managed by Managing Director (later Managing Principal) Joe Propati. (Propati 27, 43).

The CSBU evolved and changed in many ways, and by 2004, its name was changed to Aon Client Services ("ACS"). The ACS housed several groups, including a new group called Client Services Unit ("CSU"), and the PMU. Other groups included Document Production, Premium Transactions, Operations Support Services, and Surplus Lines. (Miller 129-30). These units are essential to the business operations of Defendants, as they provide critical services to clients with whom they have "client intimacy"; thus, ensuring that Defendants perform a level of service necessary to stand out in the industry and retain their clientele. (Propati 72-73, 214-20).

In 2006, a reduction in force eliminated a substantial number of positions, and in 2007 the unit was restructured. (Propati 85). As part of the 2007 restructuring, the New York, Houston and Los Angeles ACS units ceased to operate. (*Id.*). At that time - and to date - the Glenview CSU absorbed the clientele of the other three CSU locations, and certain CSU employees from the closed locations transferred to Glenview. (*Id.*). In 2007, ARS of Maryland, Inc. transitioned some of its work out of its Document Production Unit (the unit that processed certificates, etc. at the direction of CSU) to a third-party vendor, GenPact, in Delhi, India. (Propati 101, 216-17, 291-92; Huckins 124-25). The Company *did not* outsource the former duties of the CSU or PMU. (Propati 77; Jones 94-96, 188-89). As Plaintiff Angela Piersanti testified, GenPact's team was tasked with performing document production functions. (Piersanti 305).

Since 2007, interaction with GenPact personnel has been a regular part of a CSU Specialist's position. (Propati 101; Jones 94-96, 188-89; Piersanti 305-06; Miller 196). If, for example, a service request is not being timely completed by GenPact, the CSU Specialist may contact GenPact's manager to resolve any issues or problems that may exist with the service request. CSU Specialists also spend a varied amount of their time responding to questions posed to them by GenPact regarding their clients. (Jones 188-90; Piersanti 305-06; Cooper 139-44; Miller 196).

### B.    CSU Background

The duties of Client Specialists in both the New York and Glenview CSUs have varied greatly over the years in terms of client contact, work hours and tasks performed on a daily basis, depending on the time frame, industry, region or particular client being serviced. (Propati 42-43; Miller 144-45).   CSU Specialists were each assigned to service a specific group of client accounts and were generally considered the "owners" of their accounts.  (*See generally* Exs. 14-16; Miller 130-31).  Unlike a call center, in which employees field a high volume of calls and deal with a limited number of problems, CSU Specialists dealt with a lower volume of calls and inquiries from various internal and external clients, but were empowered to resolve a wide variety of issues unique to each client. (Propati 19-22).  Additionally, CSU Specialists had a high level of client intimacy, *i.e.*, a CSU Specialist was expected to get to know, and understand the needs of, each client and to thereby ensure that each client's needs were met.  (Huckins 73, 86-87).  Accordingly, the Client Specialist was the "quarterback" responsible for ensuring that all other company personnel, both inside and outside of the unit, met the service needs of the clients that they "owned." (Propati 72-73). Accordingly, while they were the "owner" and ultimately responsible for all work that was created, most specialists, regardless of level, physically "completed" only a small number of requests themselves.  (Propati 72-73; Huckins 142; Piersanti 375-76; Piersanti Ex. 5; Miller Ex. 2; Cooper Ex. 12). In doing so, CSU Specialists engaged in constant decision-making and judgment calls:

> They are the person that can run the extra five yards for a first down.  They can make that decision.  They are the person that is controlling the activity on the field.  They have professionals that do various aspects, but they drive many times what those folks do.  They use the judgment to make a call, like an audible equity line.   They make all different judgments and drive the various organizations to deliver.  They understand their competition.  They understand their client.  They have a level of client intimacy...So their overall job is about delivering that end-all service to the client.  However they do it, the judgment they use, the discretion, the knowledge they have, the client intimacy are all the part of delivering.

(Propati 72-74).

Beyond the all-encompassing "ownership" premise of their jobs, however, <u>no</u> generalities can be made with regard to the tasks performed by CSU Specialists.  The daily tasks performed by any Senior Specialist, Specialist or Associate Specialist varied by location, team, client, industry group, geography, supervisor and the day-to-day issues that arose. (Huckins 184-85).

When CSU Specialists arrived at work each day, they could not predict what tasks they would need to perform; moreover, the amount of time that they spent on each task varied every day and even within each day. (Propati 19-21). No two CSU Specialists had the same work schedule or the same policy renewal schedule. (*Id.*). Thus, there is no specific "busy time" of the year in the CSU; each person's hours might vary from his or her standard schedule for a period of time based entirely on their own clientele and the nature of the businesses they serve. (*Id.*; Jones 192-93; Ex. 15, Harris ¶ 12; Cruz ¶ 8).[2]

While Aon maintained generic job descriptions for, and placed employees into, three levels of CSU Specialists, those basic job descriptions were created for purposes of hiring. (Propati 42-43). They do not reflect the specific day-to-day duties for every Client Specialist, which are unique. (*Id.*). Indeed, Plaintiffs acknowledged that their actual job duties differed from those described in the generic job description. (Piersanti 138; Miller 249-257; Miller Ex. 20).

For example, CSU Specialists' contact with their clients, regardless of "level," varied widely. Some clients are demanding and in touch with their CSU Specialist every day; while others have only occasional interactions with CSU Specialists. (Propati 91; Piersanti 174; Cooper 117). Some clients more frequently need immediate service for certificates, such as construction clients, while others can wait longer for certificates. (Propati 15-17, 42-43; Cooper 194; Ex. 14, Erickson ¶ 7; Ex. 15, Chau ¶ 8). In the Glenview CSU, Specialists supervised the progress of their clients' requests as they were completed by other units, including GenPact, Document Production, Surplus Lines and Premium Transactions via the Account Dashboard. A CSU Specialist used his or her discretion to determine whether they should intervene to resolve any questions or problems with their clients' requests. (Cooper 118-20; Ex. 15, Leemputte ¶ 13, Chau ¶ 4; Ex. 16, Casey ¶ 7). Similarly, while some process guidelines were available to Specialists, all Specialists had discretion whether to use those guidelines, so long as a client's objectives were met. (Propati 67-74; Rootberg ¶ 5; Ex. 16, Casey ¶ 15; Ex. 15, Cruz ¶ 5).

The amount of interaction that each CSU Specialist, regardless of level, had with the supervisor of his or her team ranged from near-constant contact to virtually none. The CSU supervisors did not micromanage their teams; indeed, they did not even get involved in daily

---

[2] CSU Specialists were typically scheduled to work 37.5 hours per week. A specialist may have an increase in hours depending upon client renewal periods, complexity of clients, specialist team, staffing levels, and level of experience. (*See e.g.*, Erickson ¶ 6; Doyle ¶ 13; Arceo ¶ 11).

activities unless a very serious problem arose or a particular CSU Specialist seemed to need particular guidance. (Rootberg ¶ 3). Of course, each CSU Specialist's experience with his or her supervisor was different. Plaintiff Joyce Cooper testified that her manager spent a significant amount of time closely supervising her work; while other Plaintiffs and CSU Specialists testified that their supervisors used a "hands off" approach. (Cooper 106-07, 110; Piersanti 174-79; Ex. 15, Leemputte ¶ 12; Ex. 14, Evans ¶ 11). Moreover, the nature and frequency of Specialists' contact with supervisors varied over time and by location. For example, in the New York CSU, Miller spoke with her supervisor only a few times per week. (Miller 115, 203-04). During her tenure in Glenview, Miller spoke with her first supervisor on a daily basis if she had problems with the outsourced document production group at GenPact. (Miller 196). Miller spoke with her second supervisor on a daily basis about work load or demands from the field. (Miller 196-197). On the other hand, Miller spoke with her third supervisor several times a day in connection with requests to assist other Specialists, or to explain things, because that supervisor was new to the CSU. (Miller 201).

Even the CSU Specialists' interactions with each other cannot be generalized. Joyce Cooper testified that she did not mentor any other CSU Specialists. (Cooper 111). Other Specialists participated in a formal mentoring program, and still others spent up to 1/3 of their day informally mentoring others and answering questions. (Miller 240-41; Ex. 14, Erickson ¶ 14; Doyle ¶ 10; Evans ¶ 13; Thorp ¶ 12-14; Ginter ¶ 12; Magee ¶ 8).

### C. The Job Duties of the Plaintiffs and Other Client Specialists Vary By Individual CSU

#### 1. Plaintiff Miller

Plaintiff Miller is the only named Plaintiff from the New York action who worked in the New York CSU, beginning in 2004. (Miller 114-116). Miller's responsibilities increased, her skill sets became more advanced, and she handled more complex accounts during her tenure in the CSU. (Miller 144-145).

In 2004, Miller was assigned to the Construction Unit. (Miller 116). Construction clients were unique in that certificates often had to be issued for each individual property owned. (Miller 119). In that role, Miller worked closely with Anthony Santamaria, another specialist, on service requests several times a day, for about one year. (Miller 118, 121, 129). Client Specialist Santamaria handled requests for complex certificates, while Miller handled the others. (Miller

131-132). Miller made determinations to, and did, escalate service requests and directed them on to the correct departments for review. (Miller 126).

Within six to eight months of starting in the New York CSU, Miller became the "owner" of her own book of business of roughly 25-35 Construction accounts. (Miller 129-133). Miller became personally responsible for managing the requests for those accounts. (Miller 129). In doing so, Miller interacted with the following departments to ensure they timely completed the required outputs for her clients: Document Production, Premium Transactions, Surplus Lines, Policy Maintenance and Operations Support Services. (Miller 129-130). Miller had contact with both brokers in the field and insured clients. (Miller 130). Thereafter, in about February 2005, all construction accounts were transferred to Illinois. (Miller 133).

Miller's client base and business then changed; she was assigned a book of 25 Marine accounts in the New York CSU. (Miller 133, 136-137). One of Miller's Marine accounts, Chase Manhattan, was a "special" account for which Miller "tracked" the relocation of their employees. (Miller 137, 143). Unlike other accounts, Miller did not do certificates of insurance or policy reviewing for Chase. (Miller 137). The remainder of Miller's Marine accounts were larger than her former Construction accounts and had multiple lines of insurance, including cargo, which was unique to that industry. (Miller 139, 143). Miller was required to create individual non-standard certificates outside of the regular computer system for her Marine clients. (Miller 137-138, 144). In fact, all Marine clients were different when it came to account servicing. (Miller 139-140). For example, one client required "layered billing" by entity, which was not required by any other client. (Miller 139).[3]

Miller transferred to the Glenview, Illinois CSU in April 2007. (Miller 209; Miller Ex. 3). Miller initially continued to work on Marine accounts, and was assigned ownership of additional accounts, doubling her account load. (Miller 176). Miller worked with 7 different regions and dealt with more people internally, who were far more demanding. (Miller 179; Miller Ex. 30). Miller also dealt directly with insureds during that time period. (*Id.*). She also drafted certificates in a non-standard system used for one client, American Commercial Lines (Miller 141).

---

[3] Other specialists in the New York Marine area also handled different/complex clients in the Cargo ("Basha") and Aviation industries (Sandra Watson). (Miller 140-141, 148, 152). Specialists in the Health Care and Real Estate areas also handled different/unique issues. (Miller 140).

Miller's book of Marine clients was reassigned in August 2007, and she was unassigned for several weeks. (Miller Ex. 40, 311, 283). During that time period, she assisted others as a "floater." (Miller 283). In September 2007, Miller was assigned a new book of commercial clients, and worked on those clients until her resignation in May 2008. (Miller 66-67, 99, 153, 156, 209). In connection with the commercial book of business, Miller worked on standard certificates. (Miller 178, 316-17).

### 2. Plaintiff Piersanti

Plaintiff Angela Piersanti was hired by ARS of Maryland in November 2005. She originally worked as an Associate Client Specialist, and was promoted to Specialist in July 2007. She resigned in November 2007 for another position in the insurance industry. (Piersanti 170, 177).

During her employment, Piersanti worked with clients in various industries, including Real Estate accounts, and also handled clients that originated from the St. Louis and Kansas City field offices. (Piersanti 172-73, 178). Unlike Miller, Piersanti claims that she had little contact with her clients. (Piersanti 174; Miller 179). Piersanti also claims that she did not "own" any accounts, but was responsible for servicing more than 50 accounts. (Piersanti 187-88).[4] However, Piersanti did admit that every request that she received during her tenure in the CSU was different. (Piersanti 269-70, 314-15). She handled special requests from clients on a daily basis, and every insurance policy binder she was assigned to review and process varied from each other. (Piersanti 336, 354). Piersanti acknowledged that it was up to her to prioritize her day and determine which tasks took precedence over the others. (Piersanti 287).

### 3. Plaintiff Cooper

Plaintiff Joyce Cooper is an opt-in to the Illinois action. She only worked as a CSU Client Specialist from July 2007 to December 2008, when she transferred to the brokerage division of Aon in Houston, Texas. (Cooper 36, 51). Prior to joining the Glenview CSU, Cooper previously worked in the Document Production Unit. She considered her job in the CSU to be a promotion and admits that she had a difficult time learning the ropes in CSU. (Cooper 69).

In the CSU, Cooper enjoyed direct client contact with her clients, including a particularly large and demanding client, Hanesbrands. (Cooper 117). Unlike Miller and Piersanti, Cooper

---

[4] This testimony is in direct contrast to Plaintiff Miller and other declarants, who said that they were considered the "owner" of various numbers of accounts. (*See* Miller 130-31; *see also* Exs. 14, 15 and 16).

was assigned to at most 10 to 15 clients. (Cooper 153). In sharp contrast to Miller, she admits that although she could have stepped in to issue a certificate for another team if necessary, she had no knowledge of what it was like to work on any team other than her own. (Cooper 169, 312-13; Miller 140-41).

Cooper originally reported to Deb Rootberg, and was a member of the Southwest team. (Cooper 49-51). Cooper claims that her supervisor "micromanaged" her, but as her supervisor points out, Cooper was not performing well in the position and needed much more hands-on assistance and training than other members of her team. (Rootberg ¶ 4). Cooper testified that she was in charge of renewals for auto fleets and utilized spreadsheets provided by clients and physically prepared by document production personnel at Aon. (Cooper 67).[5]

####     4.     Company Records

Defendants maintain records of certain types of activities for each CSU Specialist. (Piersanti Ex. 5; Miller Ex. 2; Cooper Ex. 12; Piersanti 242; Miller 207; Cooper 280). Importantly, these records do not begin to track "non-output" related activities of specialists, such as contract review and related insurance counseling with clients. (*See e.g.*, Thorp ¶ 6; Piersanti 242). Nevertheless, at a minimum these records confirm that Plaintiffs Piersanti, Miller and Cooper each completed very different tasks throughout the year. For example, in 2007, Miller completed 317 "Bridge Data Maintenance" requests, while Piersanti completed seven. (Piersanti Ex. 5; Miller Ex. 2; Cooper Ex. 12). During the same year, Miller completed 204 "Special Client Projects" while Piersanti completed one. Moreover, each Plaintiff's own activities varied widely year-to-year. Piersanti, by way of example, Piersanti issued 830 certificates in 2007 and just 144 in 2007. (*Id.*). Indeed, as the above records and other testimony confirm, activities vary by client, industry, team, and from specialist to specialist regardless of level. (Ex. 14, Ginter ¶¶ 9, 11; Erickson ¶¶ 7-10).

---

[5] A "renewal" occurs when each client renews its coverage under its existing policy. This process typically happens once a year for each client and/or policy, and involves a series of tasks. (Ex. 14, Harris ¶¶ 7-12). Some renewals are straight-forward and easy to complete; in other instances, renewals are more complex and time-consuming, such that CSU Specialists may need to select and direct a team of production employees (and sometimes members of their own CSU team) to complete the renewal. (*See, e.g.*, Ex. 14; Thorp ¶¶ 9, 14; Ginter ¶ 11; Erickson ¶ 12).

## V.     THE NEW YORK PMU

### A.     Background

The Policy Maintenance Unit operated in the New York ACS until its closure in mid-2007. The general purpose of the PMU was to provide consultative services and solutions to coverage inquiries and policy changes. The primary activities of the PMU were to complete complex property and casualty policy checks, endorsement checks, audit reviews, and "retro" reviews of prior claims history. (Huckins 73-76). As explained below, the PMU Specialists' duties were acutely different from CSU Specialists. (Propati 61).

PMU Specialists were typically promoted from within or were hired with extensive experience in the insurance industry. (Huckins 64-71). It was critical to the success of PMU to hire individuals with insurance background, given the nature of their role in the Company. (*Id.*). The PMU Specialists reported to Assistant Directors, who in turn reported to Directors. (*Id.*). PMU Specialists were assigned to work on client requests based on their backgrounds and experience in the industry; for example, a Specialist with experience reviewing worker's compensation policies may have been asked to review those policies more frequently. (Huckins 121-22). In general, however, when a PMU Specialist came into work each day, he or she did not and could not know exactly what tasks lay ahead. Specialists had independence to deal with requests as they arose and in determining how to "multitask" and prioritize their day. (Ex. 17, Yu ¶ 4; De Franco ¶ 4; Ex. 11; Craig 102).

Unlike CSU Specialists, PMU Specialists were typically assigned to a team based on the specific activity they performed. (Huckins 75-76). More specifically, certain PMU Specialists were <u>solely</u> assigned to do policy checks, while others completed audits, retros or endorsements. *Id.* Plaintiff Maurice Craig described each of these sub-units of the PMU as entirely <u>separate</u> units of the Company; hence, he considered himself to be an employee of PMU because he performed policy checking tasks, but he considered the "audit and retro" employees, such as Plaintiffs Caesar and Holmes, to be employed in a different unit than he was. (Craig 92-93, 145). Similarly, Caesar considered herself to be an employee of the audit department, which operated separately from the retro department. (Caesar 56-57).

The audit function in the department involved reviewing audits from carriers to determine whether a premium should be charged or returned to a client. (Huckins 75). "Retro" reviews involved policies written with auditable exposures, such as workers' compensation provisions. A

"retro" review involved a complex analysis of claims history to determine whether the premiums should be adjusted lower or higher, depending upon the client's numbers of employees or claims. (Huckins 74-75; Propati 109). Retros required a high-level person with experience in the industry who could determine premiums based on prior losses and claims, and could perform contract interpretation in conjunction with and in light of industry standards. (*Id.*). PMU Specialists who worked on audits and retros had a particularly high level of direct client contact. (Huckins 91-92).

        **B.     The Duties of the PMU Plaintiffs and Other PMU Specialists Varied Greatly**

              **1.     Plaintiff Caesar**

Plaintiff Wendy Caesar was employed as a Client Specialist in the New York PMU from January 2002 through April 2004, when she was promoted to Senior Client Specialist.[6] She remained employed as a Senior until her separation in April 2007, when the PMU ceased to operate. (Caesar 61). Caesar was assigned to the audit and retro unit within the PMU. (Caesar 56-57). Caesar was tasked with training new employees, and monitoring their productivity. (Caesar 82, 119). She also assigned work to other PMU Specialists, including Wendy Caesar, and to the accounting team. (Caesar 80-82, 118-19; Holmes 124, 149-50). Caesar's job was "client-facing," because she dealt directly with the carriers and the insureds when conducting an audit and in resolving disputes that arose during audits. (Caesar 133-35).

              **2.     Plaintiff Holmes**

Plaintiff Janet Holmes was employed as a Client Specialist in the New York PMU from December 2001 through April 2007, when the PMU ceased to operate. (Holmes 163-64, 172). During her employment, Holmes worked exclusively for the "Audit and Retro" unit. (Holmes 121). Holmes testified that Wendy Caesar and one other Senior Specialist assigned her work. (Holmes 124, 149-50). Unlike Miller and Caesar, Holmes did not train any other employees. (Holmes 152). Holmes stated that each task she performed would differ from the last, as she worked with client accounts of various sizes, in several different industries, and policies with varying degrees of complexity. (Holmes 169).

---

[6] Plaintiff Miller worked in the PMU from 2001-2004. As such, the statute of limitations on any claims she may have under the FLSA and her testimony should be disregarded. However, to the extent this court considers her testimony, it only confirms that Plaintiffs are not entitled to conditional certification.

### 3. Plaintiff Craig

Plaintiff Maurice (Meaux) Craig was employed as a Senior Client Specialist in the PMU from January 2002 to February 2004, when he transferred to the Operations Support Services department. (Craig Exs. 17, 20, 27). Thus, Craig cannot be a member of, or representative of, an FLSA class in the New York action because any claim that Craig may have against ARSNY under the FLSA is now time-barred by the applicable statute of limitations. However, to the extent this Court nevertheless considers Craig's testimony, it confirms conditional certification should be denied. Specifically, in the PMU, Craig was responsible for conducting policy checks. Unlike Holmes and Caesar, he <u>did</u> <u>not</u> perform any audits or retros. (Craig 92-93, 97). Rather, as a policy checker, Craig's primary responsibility was to ensure that the policy he reviewed conformed with the initial policy binder. (Craig 96; Huckins 148-50). If they were reviewing a renewal policy, policy checkers reviewed the binder and the expired policy to ensure conformity and confirm any revisions to the renewed policy. If they identified a problem or concern, they could make the call to conduct a deeper review. They were also occasionally asked to do so by the brokerage unit. (*Id.*).

Craig believes that his extensive experience in the insurance industry helped him get his job in the PMU. (Craig 86). Unlike Caesar or Miller, Craig did not train or mentor any other Specialists during his employment. (Craig 97).[7]

## VI. PLAINTIFFS' REQUEST FOR CONDITIONAL CERTIFICATION OF FLSA CLAIMS IN THE NEW YORK ACTION SHOULD BE DENIED

The FLSA recognizes several exemptions from overtime law requirements. Given the job duties and responsibilities of each of the named Plaintiffs, described above, Defendants maintain that all separately qualify for the administrative exemption. *See* 29 C.F.R. § 541.200 et seq. Under the applicable FLSA regulations, the administrative exemption applies to any employee: (1) compensated on a salary basis; (2) "whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) "whose primary duty includes the exercise

---

[7] As acknowledged by Plaintiff Miller, other PMU Specialists performed different duties than the named Plaintiffs. (Miller 111, 113-114). For example, George Gross worked on "retro" audits, (Miller 165), which (as described above) were extremely complex and could require research and ongoing contact with the client and carrier. *See also* PMU Specialists' Declarations, Ex. 17.

of discretion and independent judgment with respect to matter of significance." § 541.200(a)(1)–(3).

There is no way that the New York Plaintiffs' claims could or should be adjudicated on behalf of all Specialists who worked for ARSNY's CSU and PMU in six disparate jobs. Determining whether any particular Specialist was properly classified as exempt requires an individual, fact-specific analysis of that employee's job duties, which often varied widely every year. (*See supra*). Because every Specialist performed vastly different job duties and exercised varying degrees of discretion when performing those duties, whether such individuals were properly classified as exempt simply cannot be adjudicated efficiently in one proceeding. Plaintiffs are not "similarly situated" to all Specialists in their particular unit, or even those within their own job title. The Court should thus deny Plaintiffs' motion.

### A. Legal Standard for FLSA Conditional Certification

Plaintiffs have confused the legal standards that apply at this juncture, by citing to cases that (1) are not FLSA collective actions;[8] (2) apply an inapplicable legal standard;[9] or (3) actually *denied* conditional certification, in whole or in part.[10] The only substantive question raised by Plaintiffs' Motion is whether this Court will assist Plaintiffs in notifying other present and former employees of ARSNY of the pendency of this action and invite them to opt-in if they so choose.

The FLSA does not expressly authorize the judicial involvement that Plaintiffs seek. The Act simply permits an individual to bring an action for unpaid overtime on behalf of himself "and other employees similarly situated." 29 U.S.C. § 216(b). In *Hoffmann-La Roche, Inc. v. Sperling*, the Supreme Court held that district courts "have discretion, in appropriate cases, to implement" this collective action mechanism "by facilitating notice to potential plaintiffs." 493 U.S. 165, 169 (1989). Court-facilitated notice, however, "is by no means mandatory . . ." *Harris v. FFE Transp. Servs., Inc.*, No. 3:05-CV-0077-P, 2006 U.S. Dist. LEXIS 51437 at *6, (N.D.

---

[8] *See, e.g., Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) (breach of warranty and negligent misrepresentation claim against manufacturer).

[9] *See, e.g., Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381 (W.D.N.Y. 2005) (wage deduction case; no claims related to FLSA exemptions or overtime).

[10] *See Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042 (N.D. Ill. 2003) (Norgle, J.) (denying conditional certification); *Heckler v. DK Funding, LLC*, 502 F. Supp. 2d 777 (N.D. Ill. 2007) (denying plaintiffs' conditional certification request, granting very limited class and amending proposed notice); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759 (N.D. Ill. 2004)(granting in part employer's motion to deny certification and disallowing nationwide class).

Tex. May 15, 2006); *see also Forney v. TTX Co.*, No. 05-CV-6257, 2006 U.S. Dist. LEXIS 30092 at *7-8 (N.D. Ill Apr. 17, 2006). Rather, "the relevant inquiry in each particular case is whether it would be appropriate to exercise such discretion." *Id.* Nothing in *Sperling* suggests that this discretion should be exercised when the individuals are not similarly situated.

Certification of a FLSA collective action is typically subject to a two-step *ad hoc* inquiry. *See, e.g., Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042 (N.D. Ill. 2003); *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001). At the first step, plaintiffs are required to make a modest showing that similarly situated employees exist. *Flores*, 289 F. Supp. 2d at 1045. At the second step, which typically occurs after discovery, plaintiffs must overcome a stringent evidentiary hurdle of demonstrating they are in fact similarly situated to the opt-in claimants. *Id.*

**B.    Given The Substantial Discovery In This Case, the "Second Step" Certification Analysis Should Apply**

The federal courts have never endorsed the illogical proposition seemingly advocated by Plaintiffs – *i.e.,* that a court considering the question of conditional certification should ignore the substantial, critical evidence discovered by the parties and confine itself merely to the pleadings and affidavits of Plaintiffs' choosing. More commonly, and more wisely, courts generally consider all the evidence before them and apply a level of scrutiny that such evidence merits. *See Forney v. TTX Co.*, No. 05-CV-6257, 2006 U.S. Dist. LEXIS 30092 (N.D. Ill Apr. 17, 2006) ("[A]fter discovery" has occurred, "[t]o maintain a collective action, plaintiffs must overcome a stringent evidentiary hurdle of demonstrating they are in fact similarly situated as the opt-in claimants order to obtain conditional class certification").[11] There is no requirement that the "second step" inquiry must occur only on a defendant's motion for decertification, particularly in cases such as this one, where substantial discovery has already occurred. *See Flores*, 289 F. Supp. 2d at 1045. For example, in *Valcho v. Dallas Co. Hosp. Dist.*, 574 F. Supp. 2d 618 (N.D. Tex. Aug. 19, 2008), the parties had conducted three months' of discovery when

---

[11] *See also Diaz v. Elecs. Boutique of Am., Inc.,* No. 04-0840, 2005 U.S. Dist. LEXIS 30382, 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005); *Holt v. Rite Aid Corp*., 333 F. Supp. 2d 1265, 1274-75 (M.D. Ala. 2004); *Mike v. Safeco Inc. Co. of Am*., 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003); *Reich v. Homier Distrib. Co., Inc*., 362 F. Supp. 2d 1009, 1013-15 (N.D. Ind. 2005); *Morisky v. Public Serv. Elec. and Gas Co*., 111 F. Supp. 2d 493, 498 (D.N.J. 2000); *Pfohl v. Farmers Ins. Group*, No. CV-03-3080, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004); *White v. Osmose, Inc*., 204 F. Supp. 2d 1309, 1313 n. 2 (M.D. Ala. 2002); *Ray v. Motel 6 Oper. Ltd*., No. 3-95-828, 1996 U.S. Dist. LEXIS 22565 (D. Minn. 1996).

the Court considered whether to facilitate notice to potential class members. Rejecting the plaintiff's request to conditionally certify the class, the Court noted that the plaintiff had time to produce evidentiary support "beyond the bare allegations contained in her complaint and personal declaration." *Valcho* at 622. The Court emphasized that plaintiff had an opportunity to "develop a factual basis for a collective action (i.e., to prove that there are similarly situated employees who would desire to opt in the litigation)," but failed to do so. *Id.*; *see also Harris v. FFE Transp. Servs.,* 2006 U.S. Dist. LEXIS 51437 (N.D. Tex. May 15, 2006) (holding "where the parties have had the opportunity to conduct discovery on the issue of certification, the similarly situated inquiry is more stringent...Courts generally consider the evidence submitted and the two-step inquiry collapses into one.").

Similarly, in *Bunyan v. Spectrum Brands, Inc.*, the Southern District of Illinois noted that in cases "where substantial, but not all discovery has taken place, the intermediate two-step approach seems particularly appropriate." 2008 U.S. Dist. LEXIS 59278 at *4. In that case, the parties had exchanged interrogatories, conducted depositions and exchanged a large number of documents as the parties have done here. *Id.* In light of the substantial discovery already conducted in the case, the Court aptly noted: "**The Court cannot close its eyes to the amount of discovery already performed in this action.**" *Id.* (emphasis added). Thus, the court applied the first step of the certification analysis based on all the evidence before it at the time. Because it was already obvious that determining whether certain employees were improperly classified would require a highly individualized inquiry, the Court held that the plaintiffs could not even meet their burden under the first step analysis, much less the second step. *Id.* at 5-6. As here, when it is obvious a plaintiff will not survive the second stage of the conditional certification analysis, conditional class certification serves only to multiply the proceedings, confuse the opt-ins who will eventually be dismissed from the case and increase the costs for all parties.

Ultimately, however, even if this Court does not analyze Plaintiffs' request in this case utilizing the "second step" analysis, Plaintiffs still have not made even the more modest factual showing required at the "first step." As such, their request for conditional certification should be denied, as "[e]mployees' status under the FLSA may vary, even if they have the same job title, if their job responsibilities and duties differ among each other." *Evancho v. Sanofi-Aventis U.S. Inc.*, No. 07-2266, 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 18, 2007) (internal citations omitted).

### C.  Notice to Additional Plaintiffs in this Case Serves No Judicial Purpose

The complexity, inefficiency, and unfairness of trying this case as a collective action is not mere speculation, as the Eastern District of Louisiana recently realized in *Johnson v. Big Lots Stores, Inc.*, No. 04-3201, 2007 U.S. Dist. LEXIS 96151 (E.D. La. Aug. 21, 2007). Plaintiffs in that case, which also involved allegations of misclassification under the FLSA, persuaded the court to assist in notifying other employees of the litigation.  After significant discovery occurred, the employer moved, on three occasions, to decertify the class; the court denied those motions.

At trial, plaintiffs presented deposition testimony from 20 witnesses, two corporate representatives, and two expert witnesses, and submitted more than 1,000 exhibits.  *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 569 (E.D. La. 2008).  In response to post-trial motions, the court felt compelled to reconsider its prior rulings with respect to decertification. From its post-trial vantage point, the court observed:

> At a high level of generality opt-in plaintiffs' job duties may be similar in that they are subject to a uniform job description, are required to run individual stores according to corporate policies, and are supervised by store managers. But in terms of individual job duties, the evidence shows that the opt-in plaintiffs have different responsibilities from one another and that individuals themselves will have different duties from day-to-day and within a single day. Such diversity in individual employment situations inhibits Big Lots from proving its statutory exemption defense as to all 936 opt-in plaintiffs on the basis of representative proof. And, because the plaintiffs are dissimilar, the Court cannot confidently adjudicate plaintiffs' claims or Big Lots' defense on the merits.

*Id*. at 578-79.  The court was quite clear about the source of its difficulty:

> After the Court considered all of the evidence that the parties submitted, it became obvious that it could not draw any reliable inferences about the job duties of plaintiffs as a class . . . [T]he Court reaches the inescapable conclusion that the all or nothing posture of this case makes ruling on the merits fundamentally unfair to both sides.

*Id*. at 587-88.

The problem encountered by the *Big Lots* court is that the FLSA prohibits making class-wide decisions regarding exemptions without first determining that *all* class members necessarily

must fall on the same side of the claimed exemption.[12]  There is no common question that can be decided by a jury or the court, no matter how "similarly situated" these employees may have initially seemed, when the asserted exemptions may apply to some, but perhaps not all, of the class members.  This is the exact scenario presented here.

> **D.** **Defendant ARSNY Has a Constitutional Right to Present the Factual Issues For Jury Consideration**

The back-pay remedy under the FLSA is a legal, not equitable, right.  "The Supreme Court has held that as a general rule awards of pecuniary relief such as back-pay are legal" *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 746 (D.C. Cir. 1996).  As a result, the Seventh Amendment right to a jury trial attaches to these claims.  *Lorillard v. Pons*, 434 U.S. 575, 583 (1978) ("In cases in which legal relief is available and legal rights are determined, the Seventh Amendment provides a right to jury trial"); *Cimino v. Raymark Indus.*, 151 F.3d 297, 321 (5th Cir. 1998) (holding that where legal remedies were at issue, "a jury [must] determine the distinct and separable issues of the actual damages of each of the [absent] plaintiffs").

As this Court can discern from the record evidence, the jury could learn that some class members perform primarily non-exempt duties and others perform primarily exempt duties.  Such differences and fact-specific inquiries dash any hope of submitting questions to a jury that will permit a common answer.  In the face of this divergent testimony, a pattern charge to the jury (*e.g.*, "has the employer carried its burden of proving the claimed exemption?") would unfairly constrain the jury to characterize the entire class by the same answer.  At that point, the Court and the jury will be faced with exactly the same dilemma as the *Big Lots* court - how to identify those employees, if any, who may have been misclassified.

> **E.** **In Sum, Plaintiffs in the New York Action Cannot Satisfy the FLSA Requirements for Conditional Certification**

The principal question in this case is whether Defendants can sustain their burden of proving that PMU and CSU Specialists perform job duties that qualify them as exempt from the overtime pay requirements of the Fair Labor Standards Act ("FLSA").  Given the wide range of job duties and responsibilities among the individuals who worked in the six different job titles at

---

[12] *See* U.S. Dep't of Labor, Employment Standards Admin., Wage and Hour Division, Fact Sheet 17R, November 2007 ("the exemption does not apply based upon job title alone, but rather . . . a case-by-case assessment of an employee's job duties is required.  Thus, there is no blanket exemption for claims adjusters, and when such an individualized inquiry is made, some claims adjusters will fail to satisfy the tests for exemption").

issue (*supra* 5-14), Defendants will be entitled to a jury finding as to whether an exemption applies to *each* of the Specialists and the amount of backpay, if any, owed to each party Plaintiff. (*Supra* 19).

In addition to the disparate job duties that existed among putative class members, the job duties for many of those people changed dramatically over time during the potentially relevant time period. (*See supra* 5-14). Thus, in some instances, the jury may determine that a particular Specialist was exempt from the FLSA during part, but not all, of his or her employment with one of the Defendants. Notably, in determining whether an exemption to the FLSA applies, the fact-finder is required to review the relevant job duties on a week-by-week basis. As a result, the variations in job duties among plaintiffs are compounded by the changing job duties of a given Plaintiff. Because this case is too complex to be tried in a representative fashion, facilitating notice to hundreds of additional putative plaintiffs would be an exercise in futility. Accordingly, this Court should deny Plaintiffs' Motion and rule that this case cannot be tried as a collective action.

## VII. PLAINTIFFS' REQUEST FOR RULE 23 CERTIFICATION OF THEIR IMWL CLAIMS IN THE ILLINOIS ACTION SHOULD BE DENIED

Similarly, Plaintiff Piersanti and the two other putative party-plaintiffs' request for Rule 23 certification of their IMWL claims falls woefully short of this Circuit's standards for class certification. In particular, Piersanti simply cannot show that common issues predominate among such a disparate group of potential claimants, each of whom worked different hours for different clients on different teams and for different supervisors.

### A. Legal Standard for Rule 23 Certification

Certification under FRCP 23 involves two steps. First, Plaintiffs must establish the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). FRCP 23(a); *see also Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992). Failure to establish any one of these elements precludes class certification. *Valentino v. Howlett*, 528 F.3d 975, 978 (7th Cir. 1976).

If the requirements of Rule 23(a) are satisfied, then Plaintiffs must further satisfy the demands of FRCP 23(b)(3), which requires that questions of law or fact common to the members

of the class *predominate* over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. These two requirements of Rule 23(b)(3) are generally referred to as "predominance" and "superiority." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 479 (N.D. Ill. 2007). Piersanti bears the burden of satisfying both prongs of Rule 23(b)(3). *Id.*

### B. Plaintiffs Cannot Satisfy the Rule 23 Requirements for Class Certification

For Plaintiffs in the Illinois action to succeed on their Motion for Certification, they must demonstrate that their proposed class satisfies each of the requirements of Rule 23: numerosity, commonality, typicality, adequacy, predominance, and superiority. They have not.

### 1. Plaintiffs Have Not Established Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 760 (7th Cir. 2000). Conclusory allegations regarding numerosity are insufficient. *Valentino*, 528 F.2d at 978. Here, Plaintiffs offer no evidence of the actual size of the number of the potentially aggrieved persons. It is not enough merely to state the number of potential class members in the absence of a showing how many of these employees actually have claims. *See Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000); *Siles v. ILGWU Nat'l Retirement Fund*, 783 F.2d 923, 930 (9th Cir. 1986). Only individuals who could sustain a valid, timely claim for unpaid wages under the IMWL could be members of Plaintiffs' putative class. Other than themselves - Cooper, Piersanti and potentially Miller - Plaintiffs have failed to identify any evidence that any other such class members exist.

Another factor in determining whether joinder is impractical is whether the prospective class is geographically diverse. *Radmanovich v. Combined Ins. Co of Am.*, 216 F.R.D. 424, 431 (N.D. Ill. 2003). Plaintiffs have failed to establish geographic diversity. All of the putative class members in the Illinois action worked or currently work in the Glenview, Illinois CSU office. Where individuals are located in the same geographical area, the impracticability of joinder is decreased. See *Betts v. Sundstrand Corp.*, 1999 U.S. Dist. LEXIS 9743, *16 (N.D. Ill. Jun. 21, 1999) ("The lack of geographic dispersion . . . weighs against certification); *see also Winokur v. Bell Federal Sav. & Loan Assoc.*, 1972 U.S. Dist. LEXIS 14489, *5 (N.D. Ill. Mar. 27, 1972) (certification denied to class composed of 86 savings and loan institutions all located in the Chicago area). Accordingly, class certification is not appropriate here because Plaintiffs have

not satisfied the "numerosity" requirement of Rule 23(a)(1).

### 2. Plaintiffs Have Not Established Commonality

Plaintiffs must establish their claim and present common questions of law or fact that pertain to other members of the prospective class to satisfy the commonality requirement. *Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 622 (N.D. Ill. 1989); Fed. R. Civ. P. 23(a)(2). Commonality generally exists only when the defendant has engaged in "standardized conduct" towards the members of the proposed class, thus establishing that all class members are "similarly situated." *Caulton v. Merchants' Credit Guide Co.*, 2007 U.S. Dist. LEXIS 12577, *4 (N.D. Ill. Feb. 22, 2007). In other words, class treatment is appropriate only where plaintiffs establish a common nuclei of facts applicable to the proposed class. *Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302, 308 (N.D. Ill. 1995); *Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111 (D. Kan. 1995).

Plaintiffs' Brief is devoid of any facts or evidence establishing the "standardized conduct" necessary to establish commonality. While Plaintiffs make unsubstantiated assertions of common treatment of all three categories of CSU Specialists, they offer not one scintilla of evidence tying their individual claims to those alleged on behalf of the putative class members. What the record does show is that Piersanti's own testimony – and that of Joyce Cooper and Denise Miller - largely contradicts the unsupported allegations of common treatment set forth in Plaintiffs' Brief. In short, Plaintiffs cannot establish that Aon Risk Services of Maryland, Inc. engaged in any uniform or standardized action towards them and/or any other former Glenview CSU Specialist in violation of the IMWL. Consequently, Plaintiffs have failed to establish the existence of a common question of law or fact as a matter of law.

Finally, Plaintiffs claim to establish commonality simply by stating that the overall legal questions in this case are "common" to all potential plaintiffs, and that the existence of certain guidelines and policies applicable to the CSU and PMU positions establish commonality. (Pl. Brief, pp. 13-14). Plaintiffs are wrong. *See, e.g., Burkhart-Deal v. Citifinancial, Inc.,* 2010 U.S. Dist. LEXIS 9531 at *16 (W.D. Pa. Feb. 4, 2010)("That [plaintiffs] were subject to the same policies and procedures, or performed similar job duties, while not irrelevant, is not sufficient to create a cohesive class if those commonalities are overwhelmed by separate issues that are central to the litigation."). In any event, Plaintiffs and other Specialists testified that they often performed tasks that varied, and Joe Propati testified that he did not care whether Specialists

followed process guidelines so long as clients were satisfied with their service. (*See supra*). Again, Plaintiffs ask this Court to ignore the record evidence and certify a class based on nothing more than Plaintiffs' counsel's unfounded theory of the case.

### 3. Plaintiffs Have Not Established Typicality

Plaintiffs fail to meet the typicality requirement for many of the same reasons they cannot establish commonality. A plaintiff's claim is "typical" if: (1) it arises from the same event, practice, or course of action that gives rise to the claims of other class members; and (2) the claims of the plaintiff and the class members are based on the same legal theory. *Rosario*, 963 F.2d at 1018. The issue turns on whether Plaintiffs' claims "have the same essential characteristics" as those of the proposed class members. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993). As demonstrated above, they are not. As such, liability and damages can be established only through individualized testimony concerning the particular circumstances of alleged incident for each employee. *See, e.g., Smith v. T-Mobile USA, Inc.*, No. CV 05-5274, 2007 U.S. Dist. LEXIS 60729, at *14-18 (C.D. Cal. Aug. 15, 2007) (holding off-the-clock work claims are inherently individualized).

### 4. Plaintiffs Fail to Identify Common Questions Which Predominate

For the reasons stated above, individual issues predominate over class issues and the individual inquiries necessary for adjudicating Plaintiffs' class claims render this case unmanageable. When there are "individualized issues concerning liability and 'resolution of the class members' actual claims would implicate various other fact and plaintiff-specific issues," such claims are not suitable for class certification under Rule 23(b)(3). *Hamilton v. O'Connor Chevrolet, Inc.*, 2006 U.S. Dist. LEXIS 44149, *35 (N.D. Ill. Jun. 12, 2006); *see also Burkhart-Deal,* 2010 U.S. Dist. LEXIS 9531 at *16-17.

Liability and damages in this case will turn on individual, case-by-case determinations of at least the following issues: (1) whether each employee satisfied the requirements for exempt classification, which will be based upon their daily work ; (2) whether the employee worked over forty hours in a work week where the employee claims he or she did so; (3) who the supervisor was for each employee and on which team each employee worked; (4) whether the time spent by each employee on each occasion was "work" as defined by law; and (5) whether each employee fabricated or inflated his or her overtime claims.

It would be impossible to make a generalized liability determination involving just the three individually named CSU Plaintiffs, let alone the hundreds of other potential class members. As described above, Plaintiffs Piersanti, Miller and Cooper testified that they performed vastly different tasks – and worked different hours – from each other, and their own tasks changed significantly over time. (*See supra*). Indeed, Plaintiff Miller's daily tasks changed dramatically at least three times during her tenure in the Glenview CSU alone. (Section IV.C.1, *supra*). Courts have repeatedly denied class certification when such highly individualized questions exist. *See, e.g., Basco v. Walmart Stores, Inc.*, 216 F. Supp. 2d 592, 603 (E.D. La. 2002); *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 U.S. Dist. LEXIS 95785, *13 (C.D. Cal. Sept. 7, 2006). Consequently, because individual questions predominate over questions affecting the members of the purported class, class treatment is not appropriate.

### 5. A Class Action Is Not the Superior Method Of Adjudicating Plaintiffs' Claims

An action may be maintained as a class only if a class action is superior to the available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). Here, common questions do not predominate so as to make a class action superior to individual actions. Plaintiffs' only argument that a class action is the superior method for litigating this action is that "for most putative members of the Class; it is the only way that they can present their claims." (Pl. Brief, p. 19). Yet Plaintiffs provide no evidence to support that presumption. All of the putative class members are or were professional employees of Defendants, presumably with adequate resources and wherewithal to retain counsel. Moreover, Plaintiffs' single cite in support of their argument that this case should be maintained as a class action actually directly *contradicts* their argument. On page 19 of their brief, Plaintiffs provide a block quote from *Weeks v. Bareco Oil Co.*, 125 F.2d 84, 90 (7th Cir. 1941), in support of their claim that "litigating alone against Aon is not possible or realistic." (Pl. Brief, p. 19). However, the *Weeks* Court actually held that an antitrust action was *not* maintainable as a class action, and instead allowing joinder of the named Plaintiffs' individual claims. The same theory can and should be applied here. The very nature of Plaintiffs' claims requires an individualized person-by-person determination of their hours, job duties, client assignments and team dynamics. *See Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 507126, *2 (N.D. Ill. Apr. 3, 2002); *Clark v. Experian Info., Inc.*, 233 F.R.D. 508 (N.D. Ill. 2005).

**C.     In Sum, Plaintiffs Cannot Establish the Requirements for Certification of the IMWL Claim Pursuant to FRCP 23**

Plaintiffs' Motion fails to address any of the difficult issues raised above, but merely insists that his burden is extremely light - apparently content to leave the heavy lifting to others. Here, the evidence already of record demonstrates the enormous difficulties this Court will face in managing this case consistent with the due process rights of the parties.  By procuring a group of named Plaintiffs and one opt-in, Plaintiffs has provided the Court with the opportunity to determine that even among this hand-picked group, diversity in terms of job duties and responsibilities, as well as individualized defenses, is the order of the day.  Were this case limited only to these individuals, it is already apparent that this case cannot be tried a representative action. Yet, Plaintiff asks this Court to bring hundreds of additional plaintiffs into this action without any explanation as to why the formidable problems already apparent will not be exacerbated.

**VIII.   CONCLUSION**

For the reasons set forth above, this Court should refuse to assist Plaintiffs in inviting others to join this case, and should deny their Motion in its entirety.

Respectfully submitted,

AON RISK SERVICES OF MARYLAND, INC. &
AON RISK SERVICES OF NEW YORK, INC.

By:     /s/ Amanda Helm Wright
        One of Its Attorneys

Jody A. Boquist
John A. Ybarra
Amanda H. Wright
LITTLER MENDELSON, P.C.
200 N. LaSalle Street, Suite 2900
Chicago, IL  60601
312.372.5520

**CERTIFICATE OF SERVICE**

   I, Amanda Helm Wright, an attorney, hereby certify that I caused a copy of the foregoing to be served on the following persons via this court's ECF system on this 18th day of February, 2010:

Matthew H. Armstrong
Schlichter, Bogard & Denton LLP
100 S. Fourth Street, Suite 900
St. Louis, MO 63102
marmstrong@uselaws.com

Steven Bennett Blau
Shelly A. Leonard
Blau, Brown & Leonard LLC
224 West 30th Street, Suite 809
New York, NY 10010
sblau@bbpc-law.com
sleonard@bbpc-law.com

John William Billhorn
Billhorn Law Firm
120 South State Street, Suite 400
Chicago, IL 60603
jbillhorn@billhornlaw.com

       /s/ Amanda Helm Wright
        Amanda Helm Wright